ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **SEAN SHOBE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | **Case No. 06-3307-JAR** |
| | ) | |
| **DAVID McKUNE,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on petitioner Sean Shobe's Petition for a Writ of Habeas Corpus (Doc. 1) seeking federal habeas relief from a state conviction, pursuant to 28 U.S.C. § 2254. Respondents have filed an Answer and Return (Doc. 6) and petitioner filed a Traverse (Doc. 9). After considering the parties' submissions, the Court is prepared to rule. As described more fully below, the petition is denied.

## I.    Background

On July 7, 2000, Maria Flores, the manager of the McDonald's at 95th and I-35 in Lenexa, Kansas, walked to work and arrived at approximately five o'clock in the morning. When she arrived, she was met by another employee, Carlos Garibildy. As Flores bent down to pick up a newspaper before entering the McDonald's, she heard an individual instruct Garibildy to stand up. When she turned around, Flores saw a person wearing a mask and pointing a gun. Flores could see that the person was a black man, despite the fact that he was wearing a mask made of pantyhose. The man instructed Flores to enter the McDonald's, turn off the alarm and open the safe. Flores and Garibildy walked through the lobby and into the kitchen,

where the safe was located and Flores turned off the alarm.  While Flores was attempting to open the safe, the robber demanded that Garibildy lie face down on the floor.  Once the safe was open, the robber reached inside and took out the money and instructed Flores to get down on the floor. The robber also took some gift certificates that were in the safe and the receptor portion of the phone.  While on the floor, Flores told the robber that a number of other employees would be there soon.  The robber responded by telling Flores to shut up or he would kill her.  Before leaving, the robber put something in the eyes of both Garibildy and Flores that, according to Flores, irritated and stung them.  After the robber left, Flores called the police.

Police were alerted that an armed robbery had taken place, and Officer Brad Robbins of the Leawood, Kansas, Police Department drove to the entrance ramp to I-435 from Roe Avenue to observe traffic because in the past his department had seen suspect vehicles heading toward the Missouri State Line.[1]  Officer Robbins observed a yellow Ryder van traveling at a much higher rate of speed than the other vehicles on the road, so Officer Robbins began to follow the van.  The van was clocked at eighty miles per hour as it was followed by Officer Robbins. Before it reached the exit at State Line, the van also changed lanes without signaling.  Officer Robbins decided to pull the van over for speeding and failure to signal when he heard a Lenexa police officer tell the dispatcher that a yellow Ryder van had been seen leaving the area of the armed robbery.  Officer Robbins pulled the van over at 5:17 a.m.

The van pulled over partially onto the shoulder, but still on the roadway, to the west of the exit ramp to Wornall, which is in Missouri.  Believing the van had been involved in an armed robbery, Officer Robbins drew his weapon, remained shielded by his car door, and commanded

---

[1]On his police scanner, Officer Robbins heard the dispatcher inform police that the suspected robber was a black male dressed in all black clothing.

the driver to show his  hands so that he could make sure the driver was not armed.  After about

twenty seconds, during which time the driver pulled his right arm back into the vehicle several

times, the driver pulled back into traffic and exited at Wornall Road.  Officer Robbins noticed

that the driver was wearing a black long-sleeved garment.  Officer Robbins followed the van into

an apartment complex parking lot.  Once he arrived at the parking lot, Officer Robbins

approached the vehicle to see if there was anyone inside.  He decided to wait for another officer

to arrive, as he did not know what was in the van, or if there was someone else inside.  As he

attempted to shine his flashlight into the van, Officer Robbins noticed the top of a bald black

head sticking up from behind the front fender of a pickup truck where the individual was

crouching.  The person stood and ran away when Officer Robbins instructed him to stand up and

show his hands.  The individual was dressed similarly to the robber of the McDonald's and the

person Officer Robbins had stopped in the van.  The man ran past him a second time and ignored

Officer Robbins' demand to show his hands and get down on the ground.  When a second officer

arrived, Officer Robbins and the other officer, Sergeant Heaton, cleared the van and found no

one inside, but did find a silver handgun and some loose currency in between the front seats.

A perimeter was set up by officers in an attempt to fence-in the individual that had run

from Officer Robbins and to wait for a K-9 Unit to arrive and aid in the search. During the

ensuing K-9 search, a black jacket was found by Officer Robbins, and soon after he was notified

that Kansas City, Missouri Police officers had petitioner, the suspect, in custody.

Daniel Williams, a detective with the Lenexa Police Department, transported the two

victims from the McDonald's robbery, Flores and Garibildy, to the Kansas City, Missouri Police

Department to view a line-up.  This live line-up was conducted at 10:20 a.m. on the morning of

the robbery and was videotaped.  Also present in the room with Flores and Garibildy were several detectives involved in the case.  The line-up consisted of four African-American males, including the petitioner.  Flores identified the number two person in the line-up as the person who had robbed the McDonald's earlier that morning.  The petitioner was the number two person in the line-up.  Flores identified the petitioner based upon his body, his shoes, his height, and voice. Petitioner was advised of his *Miranda* rights prior to Detective Williams speaking with him. Petitioner denied being in Lenexa, although he admitted being in Kansas, and denied any knowledge of the McDonald's robbery.

Following a jury trial in the District Court of Johnson County, Kansas, petitioner was convicted of one count of aggravated robbery, in violation of K.S.A. § 21-3427, and two counts of kidnapping in violation of K.S.A. § 21-3420.  He was sentenced to a term of 216 months on Count 1, 59 months on Counts 2, to run concurrent to Count 1, and 59 months on Count 3 to run consecutive to the sentences on Counts 1 and 2, for a total sentence of 275 months.[2]  The Kansas Court of Appeals affirmed the conviction on direct appeal,[3] and the Kansas Supreme Court denied a petition for review.[4]  Petitioner filed a motion under K.S.A. § 60-1507 for collateral relief in Johnson County District Court.  After conducting an evidentiary hearing on petitioner's motion, the court denied relief on all issues.  The Kansas Court of Appeals affirmed the denial of petitioner's § 60-1507 motion and the Kansas Supreme Court denied review.[5]

---

[2](R. Case File at 39–43.)

[3]*State v. Shobe*, No. 87-307 (Kan. Ct. App. Feb. 21, 2003).

[4]64 P.3d 469 (Kan. 2003).

[5]*Shobe v. State*, No. 92,173, 2005 WL 3030291 (Kan. Ct. App. Nov. 10, 2005), *rev. denied*, No. 92,173 (Kan. Mar. 28, 2006).

## II.      Standard

Petitioner proceeds pro se.  The Court must construe pro se pleadings liberally and apply a less stringent standard than what is applicable to attorneys.[6]  However, the Court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[7]  The Court need only accept as true plaintiff's "well-pleaded factual contentions, not his conclusory allegations."[8]

Because petitioner "filed his habeas petition after April 24, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") govern this [proceeding]."[9]  The AEDPA "'circumscribes a federal habeas court's review of a state-court decision.'"[10]  Under 28 U.S.C. § 2254(d), a federal court may not grant habeas relief on any claim adjudicated in state court,[11] unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.

---

[6]*Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005); *Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[7]*Whitney*, 113 F.3d at 1173.

[8]*E.g.*, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[9]*Martinez v. Zavaras*, 330 F.3d 1259, 1262 (10th Cir. 2003) (citing *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997)), *cert. denied*, 540 U.S. 973 (2003).

[10]*Anderson v. Mullin*, 327 F.3d 1148, 1152 (10th Cir. 2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003)), *cert. denied*, 540 U.S. 916 (2003).

[11]As petitioner indicates in his Petition, all of his claims have been adjudicated in state court, either on direct appeal or on collateral review.

A state court's decision is "contrary to" an established federal law if the state court reaches a different result than the Supreme Court would when presented with facts that are "materially indistinguishable from a relevant Supreme Court precedent" or if the state court "applies a rule that contradicts the governing law" set forth in Supreme Court cases.[12]  A decision is an "unreasonable application" of clearly established federal law if a "state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case."[13]  "Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."[14]  Unreasonable application of facts includes an unreasonable extension of a principle, or an unreasonable refusal to extend a principle to the facts at hand.[15]  The courts are to employ an objective standard in determining what is unreasonable.[16]

Although unreasonable determinations of fact are a second basis for a writ, a state court's determination of a factual issue shall be presumed to be correct.  The petitioner has the burden of rebutting this presumption by clear and convincing evidence.[17]  "This presumption does not

---

[12]*Williams v. Taylor*, 529 U.S. 362, 405 (2000).

[13]*Id.* at 413.

[14]*Snow v. Sirmons*, 474 F.3d 693, 696 (10th Cir. 2007).

[15]*Williams*, 529 U.S. at 407.

[16]*Id.* at 409.

[17]*Martinez v. Zavaras*, 330 F.3d 1259, 1262 (10th Cir. 2003), *cert. denied*, 540 U.S. 973 (2003); *Fields v. Gibson*, 277 F.3d 1203, 1221 (10th Cir. 2002).

extend to legal determinations or to mixed questions of law and fact."[18]  "That is, the 'deferential standard of review does not apply if the state court employed the wrong legal standard in deciding the merits of the federal issue.'"[19]  "Ultimately, our review of the state court's proceedings is quite limited, as section 2254(d) sets forth a highly deferential standard for evaluating state-court rulings."[20]

## III.    Analysis

Petitioner articulates the following issues as grounds for relief: (1) sufficiency of the evidence to support the kidnapping conviction; (2) due process violation based on a suggestive police line-up; (3) *Miranda* violation; (4) Fourth Amendment violations related to the traffic stop; and (5) ineffective assistance of trial counsel.  The Court addresses each in turn.

### A.    *Sufficiency of the Evidence*

Petitioner was convicted on two counts of kidnapping under K.S.A. § 21-3420.  Under the statute, petitioner must have committed the kidnapping "to facilitate flight or the commission of any crime."[21]  On direct appeal, the Kansas Court of Appeals concluded that the movement of the victims—moving them to the kitchen and using one of them to open the safe—facilitated the commission of the robbery and thus, the kidnapping conviction was supported by substantial evidence.  Petitioner's first ground for relief is that the evidence that the victims were moved cannot sustain the kidnapping convictions because it was not done to facilitate the commission of

---

[18]*Martinez*, 330 F.3d at 1262 (citing *Herrera v. Lemaster*, 225 F.3d 1176, 1178-79 (10th Cir. 2000)).

[19]*Id.* (quoting *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003)).

[20]*Anderson v. Mullin*, 327 F.3d 1148, 1152 (10th Cir. 2003) (internal citations omitted), *cert. denied*, 540 U.S. 916 (2003).

[21]K.S.A. § 21-3420(b).

aggravated robbery.

When reviewing a sufficiency of the evidence claim in a habeas petition, the Court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[22]  Sufficiency of the evidence is a mixed question of law and fact, so the Court must apply both 28 U.S.C. § 2254(d)(1) and (2).[23]  The Court defers to the determination of a factual issue by the state court and this presumption can only be overcome by clear and convincing evidence.[24]

The issue before the Kansas Court of Appeals on direct appeal was whether the confinement of the victims was merely incidental to the commission of the aggravated robbery and of a kind inherent to the nature of aggravated robbery, or rather, had some significance independent of the aggravated robbery.  The parties and the Kansas Court of Appeals properly identified the leading Kansas case on the issue, *State v. Buggs.*[25]  There, the Kansas Supreme Court clarified the meaning of "facilitate" in the statute, explaining that the "taking or confining, in order to be said to 'facilitate' a crime, must have some significant bearing on making the commission of the crime 'easier' as, for example, by lessening the risk of detection."[26]  The

---

[22]*Redden v. Calbone*, 223 F. App'x 825, 828 (10th Cir. 2007) (quoting *Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004)).

[23]*See Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1819 (2007).  But the Court is cognizant that a state court's interpretation of a state statute "is a matter of state law binding on this court." *Parker v. Scott*, 394 F.3d 1302, 1319 (10th Cir. 2005).

[24]*Id.*

[25]547 P.2d 720 (Kan. 1976).

[26]*Id.* at 730.

Court provided the following examples:

> A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is.  The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is.  The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is.  The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding.[27]

The Court of Appeals found that there was substantial evidence that petitioner moved the victims in this case and that the movement of the victims made the aggravated robbery easier to commit and reduced the risk of detection.  The court pointed to evidence that petitioner forced the store manager and another employee to disable the alarm, forced them to accompany him to the kitchen to open the safe, forced them to lie on the ground and then put an irritant in their eyes.  The court concluded that these actions are not inherent to the crime of aggravated robbery and made the robbery easier to commit.  Furthermore, the fact that petitioner moved the victims to the kitchen, where they could not be seen, reduced the risk of detection.  The Kansas Court of Appeals found that these facts were analogous to those in *Buggs*, where the victims were accosted outside the restaurant where they were open to public view.  Because the movement of the victims in *Buggs* "substantially reduced the risk of detection," it facilitated the crimes of robbery and rape.[28]

Petitioner does not contend that the evidence does not support the facts identified by the court in support of its holding.  Instead, petitioner urges that the movement of the victims only

---

[27]*Id.* at 731.

[28]*Id.* at 731–32.

made the robbery more convenient.  Petitioner cites *State v. Honeycutt*, but this case is an

unpublished decision that petitioner failed to attach to his Traverse.  The decision of the Kansas

Court of Appeals was not contrary to federal law, nor was it an unreasonable application of law

for the Kansas Court of Appeals to find substantial evidence to support the conclusion that the

movement of the victims in this case facilitated the aggravated robbery.

**B.**     ***Suggestive Line-Up***

Next, petitioner argues that he was placed in a suggestive line-up because he was the only

person in the line-up wearing clothing that matched certain items of clothing that the victims

remembered the robber wearing.  In particular, petitioner argues that he was the only one in the

line-up wearing black pants and expensive-looking tennis shoes, the same clothing the victims

had previously reported the robber wearing.  On direct appeal, the Kansas Court of Appeals

found that the lineup was not unduly suggestive because the men were all wearing a variety of

clothing, petitioner was not wearing exactly identical clothing as the robber had reportedly been

wearing, and Flores did not only identify petitioner based on his clothing but also based on his

body type, height, and voice.

The Kansas Court of Appeals correctly applied the law in determining whether the lineup

identification should have been suppressed:

> A trial court's admission of eyewitness identification
> violates a defendant's right to due process only when the procedure
> by which the witness identifies the defendant "is so unnecessarily
> suggestive that it is 'conducive to irreparable mistaken
> identification.'"  *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th
> Cir.1993) (quoting *Kirby v. Illinois*, 406 U.S. 682, 691, 92 S.Ct.
> 1877, 32 L.Ed.2d 411 (1972)).  For instance, courts have found
> eyewitness-identification procedures unnecessarily suggestive
> when a witness is asked to pick the suspect out of a lineup or photo
> array of individuals with strikingly different characteristics.  *Id.*  If

the court finds the procedure unnecessarily suggestive, it then considers whether under the totality of the circumstances the identification was reliable. *Id.* at 1489-90. The court considers several factors to determine the reliability of eyewitness testimony, including the witness's ability to view the accused at the time of the crime, "the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).[29]

Petitioner argues that the court unreasonably applied *Foster v. California*.[30] That case involved the robbery of a Western Union office where the only witness was a late-night manager. The lineup involved three men: one, the defendant, who was almost six feet tall, and two men who were each about five feet five or six inches tall. Also, the defendant wore a leather jacket, similar to the one which the manager said the robber had worn. After viewing the lineup, the manager could not positively identify the robber. The manager was then allowed to speak to the defendant, who he "thought" was the robber. But the manager was still not sure about the identification. About one week to ten days later, the police called the manager to view another lineup. That lineup included five men and the defendant was the only person who had also been in the first lineup. The manager was then able to positively identify the defendant as the robber.[31]

In *Foster*, the Supreme Court found the lineup procedure unfair because "[i]n effect, the

---

[29]*Robison v. Ward*, 232 F. App'x 785, 788 (10th Cir. 2007).

[30]394 U.S. 440 (1969).

[31]*Id.* at 441–42.

police repeatedly said to the witness, 'This is the man.'"[32]  The Court found that the pretrial

lineup was arranged in such a way as to make the identifications "virtually inevitable," violating

due process.[33]  The Court fails to see how this case applies to the lineup at issue here.  While

certainly one element of the suggestive lineup in *Foster* involved the fact that the defendant wore

a jacket similar to the robber in the first lineup, certainly the Court did not hold that this fact

alone caused the due process violation.  Instead, the Court emphasized the fact that the defendant

stood out not only because of his jacket, but also because of the height differences with the other

two men.  When that did not lead to a positive identification, the police allowed a one-on-one

confrontation between the witness and the defendant and then arranged for a second lineup

where the defendant was the only one who had also participated in the first.  All of these

elements together led to the Court's holding in *Foster*.

    In contrast, the only suggestive elements  presented to the Kansas Court of Appeals by

petitioner involved the clothing that he wore during the lineup.  The court identified the

following evidence to support its conclusion that petitioner's clothing did not create an

impermissibly suggestive lineup: the robber was described as being dressed entirely in black,

including a black jacket and pantyhose over his face, yet at the lineup, petitioner was wearing a

light-colored shirt; there was another man in the lineup wearing a light-colored shirt; and Flores

did not identify petitioner based only on his clothing, but also on his body type, height, and

voice.

    Petitioner urges that the court's reliance on the fact that he wore a light-colored shirt was

---

[32]*Id.* at 443.

[33]*Id.*

"meaningless" because Flores stated that her identification was based mostly on the tennis shoes and pants. This is a purely factual question and the Court presumes the state court's resolution of it is correct.[34] Petitioner does not come forward with clear and convincing evidence to the contrary. Indeed, he does not point the Court to any place in the record that supports this factual assertion. Accordingly, the Court is unable to find that the state court's denial of petitioner's motion to suppress the lineup identification was contrary to federal law, or involved an unreasonable application of federal law.

**C.     *Miranda* Violation**

Petitioner's next argument is that the state courts should have suppressed the statements police obtained from him while he was in custody without first providing him with *Miranda* warnings. His argument is based on the conduct of the police officers when they apprehended him in the parking lot where the Ryder van was found. Petitioner argues that when he was apprehended, the officers began interrogating him in violation of *Miranda* and that the State used his answers to their questions as evidence against him at trial.

The Kansas Court of Appeals concluded that because petitioner was not "in custody" at the time that the questions at issue were asked, he was not entitled to *Miranda* safeguards and his statements were admissible. The Kansas Court of Appeals found that the officers complied with K.S.A. § 22-2402 when they apprehended petitioner for questioning:

> (1) Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and

---

[34]The trial transcript wholly supports the court's rendition of the evidence. Flores testified that she did not just base her identification on petitioner's shoes, but also on "his body build, the stockiness, the height, and the voice." (R. Jury Trial Tr., vol. II at 23.)

an explanation of such suspect's actions.
(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that such officer's personal safety requires it, such officer may frisk such person for firearms or other dangerous weapons.  If the law enforcement officer finds a firearm or weapon, or other thing, the possession of which may be a crime or evidence of crime, such officer may take and keep it until the completion of the questioning, at which time such officer shall either return it, if lawfully possessed, or arrest such person.

Petitioner argues that this law is in conflict with clearly established federal constitutional law and that because the arrest and interrogation occurred in Missouri, the Kansas statute should not apply anyway.

Under federal law, a law enforcement officer's "failure to administer *Miranda* warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and the confession is inadmissible with no need for the 'time consuming and difficult enquiry into voluntariness.'"[35] For the *Miranda* safeguards to apply, (1) "the suspect must be in 'custody,' and [(2)] the questioning must meet the legal definition of 'interrogation.'"[36] The government bears the burden of showing that these rights were waived and the voluntariness of the statements.[37] A person is in "custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest.[38] The relevant inquiry for determining whether an individual is

---

[35]*United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (quoting *United States v. Patane*, 542 U.S. 630, 646 (2004) (Souter, J., dissenting))), *cert. denied*, 127 S. Ct. 1343 (2007).

[36]*United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

[37]*Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (plurality); *United States v. Nelson*, 450 F.3d 1201, 1209 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 326 (2006).

[38]*See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam).

in "custody" is whether a reasonable person in that position would "believe [his] freedom of action had been curtailed to a 'degree associated with formal arrest.'"[39]  "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive."[40]  When making this determination, several factors should be taken into account, such as (1) whether the suspect is made aware he is free to refrain from answering questions and may end the interview; (2) the nature of the questioning; and (3) whether the interview was conducted in a "police dominated" atmosphere.[41]

The evidence presented at the suppression hearing established that Officers Hammer and Tyson of the Kansas City, Missouri Police Department received a dispatcher's broadcast about a foot chase by Leawood police with an armed robbery suspect in their patrol area.  The suspect was described as a black male, approximately six feet tall, wearing a blue ball cap, a black jacket and black pants.  The description was later updated because police officers had found the suspect's black jacket.  The officers drove around the perimeter of the area that the Leawood officers were searching, having been informed that the suspect had fled from his vehicle in an apartment complex at about 104th Street and Wornall.  In a different parking lot, about one block south of where the vehicle had been left, the officers saw a man fitting the description of the suspect about 300 to 400 yards away next to a white minivan.

Officer Tyson drew his weapon and directed petitioner to come over to them.  Officer Hammer had petitioner place his hands on the patrol vehicle and frisked him for weapons.

---

[39]*United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993), *cert. denied*, 515 U.S. 1168 (1995) (quoting *Beheler*, 463 U.S. at 1125; *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

[40]*Griffin*, 7 F.3d at 1518.

[41]*Id.* 1518–19.

During the pat-down, Officer Hammer asked petitioner what he was doing, where he lives, what his name is and whether he has identification.  Petitioner told the officers he was taking a walk. Petitioner did not provide the officers with his name, or identification and told them that "he lives here."  Officers Tyson and Hammer then handcuffed petitioner and turned him over to Leawood officers.  The encounter lasted not more than five minutes.

K.S.A. § 22-2402 is not contrary to federal law.  Under *Terry v. Ohio*,[42] police may make an investigatory stop when they lack probable cause necessary to make an arrest, but are still able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[43]  Under similar circumstances, the Tenth Circuit has held that police had the necessary objective basis to make an investigatory stop "to determine the identities" of the suspects and "investigate the circumstances that provoke suspicion."[44]  Officer Tyson's display of his weapon did not convert the stop into an arrest because, as Officer Hammer testified, the officers had specific information that the suspect was armed and dangerous, given that he was suspected of having committed an armed robbery.[45] K.S.A. § 22-2402 tracks the requirements of *Terry* and is not contrary to federal law.  Subsumed by the courts' finding that the officers complied with the state statute when questioning petitioner, is the court's conclusion that he was not in custody for purposes of *Miranda*. Petitioner was not formally arrested at the time he was questioned, but instead stopped and

---

[42]392 U.S. 1 (1968).

[43]*Id.* at 21.

[44]*See United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982).

[45]*Id.*; *United States v. Burciaga-Burciaga*, 147 F. App'x 725, 729 (10th Cir. 2005).

frisked pursuant to a valid investigatory detention.  Accordingly, the Kansas Court of Appeals

did not reach a conclusion contrary to federal law, nor did it unreasonably apply federal law to

the facts of this case.[46]

### D.        *Fourth Amendment Violations*

Petitioner seeks habeas review of the state courts' denial of his motions to suppress under

the Fourth Amendment.  However,

> where the State has provided an opportunity for full and fair
> litigation of a Fourth Amendment claim, a state prisoner may not
> be granted federal habeas corpus relief on the ground that evidence
> obtained in an unconstitutional search or seizure was introduced at
> his trial.  In this context the contribution of the exclusionary rule, if
> any, to the effectuation of the Fourth Amendment is minimal, and
> the substantial societal costs of application of the rule persist with
> special force.[47]

Petitioner states, without citation to legal authority, that *Stone* is no longer good law because it is

not explicitly incorporated by 28 U.S.C. § 2254(d).  But AEDPA did not overrule *Stone* and this

Court continues to be bound by its holding.[48]

Petitioner does not argue that he was not given a full and fair opportunity to litigate his

Fourth Amendment claims in state court.  The district court held a suppression hearing on the

Fourth Amendment issues before denying the motion to suppress.  Petitioner also raised his

Fourth Amendment claims at trial and the district court again denied his motion to suppress.

---

[46]The Court further notes that the information petitioner sought to suppress does not appear to be testimonial or incriminating, nor did the officers' questions require disclosure of testimonial evidence.  Indeed, petitioner refused to answer almost every question posed.  *See California v. Byers*, 402 U.S. 424, 431–32 (1971) (explaining that the disclosure of name and address is a neutral act); *United States v. McCurdy*, 40 F.3d 1111, 1115 (10th Cir. 1994).

[47]*Stone v. Powell*, 428 U.S. 465, 494–95 (1976) (footnotes omitted).

[48]*See, e.g., Canon v. Gibson*, 259 F.3d 1253, 1260–61 (10th Cir. 2001) (applying *Stone*).

17

Petitioner's claims were further considered and rejected on direct appeal.  Therefore, the Court finds the rule in *Stone* applies and petitioner is not eligible for habeas relief on his Fourth Amendment claims.

### E.   *Ineffective Assistance of Counsel*

Petitioner claims ineffective assistance of trial counsel in (1) failing to have the crime scene security video enhanced to show the footwear worn by the robber, (2) failing to object to the State's use of his juvenile adjudications at sentencing, (3) refusing to allow petitioner to testify at trial, (4) failing to properly argue for suppression of evidence due to the illegal search and seizure of the search of the van.

In order to succeed on a claim of ineffective assistance of counsel, petitioner must meet the two-prong test set forth in *Strickland v. Washington*.[49]  Under that test, petitioner must first show that his counsel's performance was deficient because it "fell below an objective standard of reasonableness."[50]  Second, he must show that counsel's deficient performance actually prejudiced his defense.[51]  "There is a strong presumption that counsel's performance falls within the 'wide range of professional assistance,' [and] the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged actions was not sound strategy."[52]  Counsel's performance must be considered from counsel's perspective at the time of the alleged error and in light of all the circumstances.[53]

---

[49]466 U.S. 668 (1984).

[50]*Id.* at 688.

[51]*Id.*

[52]*Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).

[53]*Id.*; *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

1.      **Failure to Enhance the Videotape**

Petitioner first argues that trial counsel should have honored his request that the security video from the robbery be enhanced to show the robber's tennis shoes.  According to petitioner, enhancing the videotape would have been exculpatory because it would have shown that the robber was wearing different tennis shoes than the ones petitioner was wearing when he was arrested.  The Johnson County District Court conducted a hearing on these claims and petitioner's trial counsel, John Jenab, testified.  Jenab testified that he believed it would be in error to enhance the crime scene footage photographs because if there was a discrepancy between the shoes worn by the robber and those worn by petitioner at the time of arrest it would invite the State to put on a rebuttal case.  Jenab believed that the State's rebuttal evidence would include a Nike shoe box for the shoes petitioner was wearing at the time of arrest, which officers found in the Ryder van.  Jenab believed such evidence would allow the State to argue that petitioner could have changed his shoes after the robbery and thrown the old ones away.  In contrast, by not enhancing the photograph, Jenab could still argue in his closing argument after the close of evidence that the shoes were different, without risking a rebuttal case by the State.

The district court found that Jenab's assessment of the evidence on this matter was "within the parameters of reasonable professional performance," and the Kansas Court of Appeals upheld that ruling.  Petitioner argues that Jenab's risk assessment of the State putting on rebuttal evidence is "laughable," because he does not believe a theory that the robber changed shoes is plausible.  But this is not enough for this Court to conclude that the state courts' resolution of the matter was objectively unreasonable.  The state courts' concluded that Jenab's decision to not enhance the photographs was sound trial strategy, and Petitioner is unable to

show the state court that under prevailing professional norms, counsel's performance was deficient.  The evidence supports the state courts' conclusion, given that they must consider the perspective of counsel at the time.  The evidence likewise supports the trial court's conclusion that it could have actually been more prejudicial for Jenab to present the enhanced videotape.  Because petitioner is unable to show that the state courts decision on this matter was contrary to or an unreasonable application of federal law, the claim fails.

### 2.  Juvenile Adjudications

Next, petitioner urges that Jenab was ineffective because he failed to object to the use of certain juvenile adjudications in calculating his sentence.  According to petitioner, the juvenile convictions were obtained in violation of his Sixth Amendment right to counsel.  "Petitioner requested Mr. Jenab to challenge them but he refused to even look into the matter."  The record does not support petitioner's contention.  On March 26, 2001, Jenab filed an Objection to Criminal History Score, on petitioner's behalf.[54]  In the motion, Jenab objected to the inclusion of three entries for adjudications in Johnson County Case Number 87JV1258.  Jenab argued that petitioner denied these occurred or, alternatively, that they could not properly be scored against him.  Jenab also filed a Motion for Downward Durational Departure.[55]  In that motion, Jenab argued that even if the court opted not to grant his objection, the court should consider that the juvenile adjudications occurred fourteen years before, and that petitioner had no convictions or adjudications since that time.  The trial court, however, denied these motions.

Petitioner contends that Jenab should have collaterally attacked his juvenile adjudications

---

[54](R. Case File at 133.)

[55]*Id.* at 135.

due to constitutional deficiencies.  The district court held a hearing on petitioner's ineffective

assistance claims and Jenab testified.  According to Jenab, petitioner had told him only that he

did not recall the convictions; he did not inform Jenab of any alleged constitutional deficiencies

such as ineffective assistance of counsel.  The trial court concluded that, based on the

information provided by petitioner to Jenab, Jenab proceeded as any reasonable attorney

would—he objected to the inclusion of those convictions in calculating petitioner's criminal

history for sentencing purposes and the Kansas Court of Appeals upheld this finding.  Petitioner

is unable to show that the state courts' conclusions are contrary to federal law.[56]  Further, based

on Jenab's testimony and the objections that he filed, the Court is unable to conclude that the

state courts' unreasonably applied federal law when they determined that Jenab's performance

did not fall below an objective standard of reasonableness.

### 3.    Petitioner's Right to Testify

Petitioner argues that Jenab refused to allow him to testify on his own behalf.  According

to petitioner, he would have testified in support of a duress defense.  A criminal defendant has a

constitutional right to testify on his own behalf at trial.[57]  Furthermore,

> The decision whether to testify lies squarely with the

---

[56]The cases cited by petitioner are inapposite.  *Girtman v. Lockhart* deals with counsel's failure to object to the use of juvenile convictions in determining the defendant's habitual offender status.  942 F.2d 468 (8th Cir. 1991). Unlike this case, the defense attorney did not object to an adult conviction and the defendant had been transferred from juvenile to adult court without proper constitutional safeguards.  *Id.* at 477.  *Green v. United States* is a habeas petition involving a prisoner in federal custody.  880 F.2d 1299 (11th Cir. 1989).  There, the Eleventh Circuit considered whether three state court convictions that enhanced the defendant's sentence under statute should have been used if the defendant was unrepresented by counsel when he pled guilty to those charges.  *Id.* at 1300–01.  It was undisputed that defendant was not represented by counsel.  The Court explained that the prior convictions should not have been used to enhance the defendant's sentence.  *Id.* at 1303.  Here, there is no evidence in the record of a constitutional infirmity with the juvenile adjudications at issue, aside from petitioner's conclusory allegations. Further, this Court is considering the state courts' determination of this issue; a different standard than it utilizes for prisoners in federal custody.

[57]*Rock v. Arkansas*, 483 U.S. 44, 49–52 (1987).

> defendant; it is not counsel's decision.  Defense counsel should
> inform the defendant that he has the right to testify and that the
> decision whether to testify belongs solely to him.  Counsel should
> also discuss with the defendant the strategic implications of
> choosing whether to testify, and should make a recommendation to
> the defendant.  Yet counsel lacks authority to prevent a defendant
> from testifying in his own defense, even when doing so is suicidal
> trial strategy.[58]

But, the Court does not have a duty to ensure that a defendant who does not testify has waived

that right.[59]  Moreover, "[w]hen a defendant does not alert the trial court of a disagreement,

waiver of the right to testify may be inferred from the defendant's conduct."[60]

The state court conducted an evidentiary hearing to develop a record on this claim.

Petitioner testified that he told Jenab that he had been coerced by three of his acquaintances to go

with them to commit the robbery so that they could use his gun.  Petitioner claimed that he could

implicate one of these other men in the actual robbery.  At the evidentiary hearing, petitioner

testified that he told Jenab about his coercion defense, but stopped short of saying that he had

insisted on testifying.  Jenab, on the other hand, testified that petitioner consistently and

explicitly told him he did not wish to testify.  There is also no evidence in the record that

petitioner made any attempt to alert the trial court to his desire to testify when Jenab rested at

trial.  Because petitioner failed to alert the trial court that he desired to testify or that there was a

disagreement between him and his attorney, the waiver of the right to testify can be inferred.[61]

The trial court found that Jenab's testimony was more credible than petitioner's and that he did

---

[58] *Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004)  (citations omitted).

[59] *United States v. Williams*, 139 F. Appx. 974, 976 (10th Cir. 2005) (citing *United States v. Ortiz*, 82 F.3d 1066, 1069–70, n.8 (D.C. Cir. 1996); *United States v. Janoe*, 720 F.2d 1156, 1161 (10th Cir. 1983).

[60] *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000); *see Williams*, 139 F. Appx. at 976.

[61] *See United States v. Williams*, 139 F. Appx. 974, 976 (10th Cir. 2004).

not override petitioner's decision to testify.  This Court gives deference to this factual finding, and petitioner does not come forward with clear and convincing evidence to the contrary. Accordingly, the state courts' decision on this issue was not contrary to, nor an unreasonable application of federal law.

### 4.       Fourth Amendment Arguments

Petitioner claims that Jenab should have made a number of Fourth Amendment arguments to try to suppress the evidence obtained from the Ryder van.  Specifically, petitioner argues that Jenab was ineffective for failing to object to the stop of the van, the state's assertion that the search was incident to arrest, and the state's assertion that the search was a valid inventory search.  In order to show that Jenab's performance was objectively unreasonable for failing to file a motion to suppress in this case, petitioner must show that such a motion "was meritorious and that a reasonable probability exists that the verdict would have been different absent the excludable evidence."[62]

On the first issue, the record shows that Jenab did file a motion to suppress based on an illegal traffic stop of the van.  In that motion, Jenab argued that the initial stop of the Ryder van was illegal because Officer Robbins followed the van into Missouri only to conduct a traffic stop, not because he had reason to believe petitioner had committed a felony or was driving under the influence, pursuant to Mo. Rev. St. § 544.15(1).  That motion also argued that the illegal stop tainted the subsequent search of the vehicle because it directly caused petitioner to "abandon" the vehicle and thus, the evidence seized constituted fruit of the poisonous tree.  The district court denied the motion to suppress.  The court reasoned that because the petitioner was

---

[62]*Hooper v. Mullin*, 314 F.3d 1162, 1176 (10th Cir. 2002), *cert. denied*, 540 U.S. 838 (2003).

never seized when his vehicle was stopped, the Fourth Amendment was never implicated and the later search of the car could not be tied to any illegality involved in the brief stop on the interstate.  The court's reasoning was based on the fact that, despite Officer Robbins' attempting to stop the van, petitioner did not yield to his show of authority and instead, drove away after stopping briefly.  Therefore, petitioner was not seized until he submitted to the authorities in the apartment complex parking lot later.  This holding was upheld by the Kansas Court of Appeals on direct appeal.  Because Jenab did object to the stop of the van, petitioner's first assertion of ineffective assistance on the Fourth Amendment claims is misplaced—Jenab's performance did not fall below an objectively reasonable standard.  Further, given the state courts' rulings on the motion to suppress, petitioner is unable to show prejudice.

Petitioner next argues that Jenab was ineffective for failing to object to the search of the van based on certain exceptions to the warrant requirement.  The district court and the Kansas Court of Appeals both found that petitioner's seizure did not occur until he was apprehended in the parking lot and arrested.  At the habeas hearing, Jenab testified that petitioner never asked him to file motions to suppress based on these arguments.  He further testified that because it was evident that petitioner abandoned the van in the parking lot, exceptions to the search warrant applied, including the inventory search exception.

Petitioner suggests that Jenab should have objected to the State's assertion that the vehicle was abandoned because it was parked on private property and the officers did not know who it belonged to.  But the record does not support this conclusory allegation.  The record shows that Officer Robbins followed the van after it drove away from the attempted traffic stop to an apartment complex parking lot.  When Officer Robbins approached the vehicle, he saw a

bald black head sticking up from behind the front fender of a pickup truck, who stood and ran away when the officer confronted him.  Officer Robbins testified that the individual was wearing clothing similar to the reported robber and the man driving the van that he stopped.  When another officer arrived, the two "cleared" the van, finding no one inside and locating a handgun in between the front seats.  Shortly thereafter, Kansas City, Missouri officers had taken custody of the petitioner.  Even overlooking his misrepresentation of the evidence, petitioner is unable to show that the state courts' decision that Jenab's performance did not fall below an objective standard of reasonableness, was contrary to federal law or how it was an unreasonable application of federal law.  Accordingly, the petition is denied on this ground, as well.

     **IT IS THEREFORE ORDERED BY THE COURT** that the Petition for a Writ of Habeas Corpus (Doc. 1) filed pursuant to 28 U.S.C. § 2254 is **DENIED**.

     **IT IS SO ORDERED.**

     Dated this 16th day of October 2007.

                       **S/ Julie A. Robinson**
                       JULIE A. ROBINSON
                       UNITED STATES DISTRICT JUDGE